JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Trustees and Fiduciaries of the Iron Workers District Council (Philadelphia and Vicinity)Benefit and Pension Plans, et al.

**DEFENDANTS**
Carson Concrete Corporation

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joseph T. Cleary, Esq. and Ryan R. Sweeney, Esq.
Cleary, Josem & Trigiani, LLP, 325 Chestnut St. Suite 200
Philadelphia, PA 19106   (215)735-9099

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine / ☐ 345 Marine Product Liability |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
|  | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  | ☐ 362 Personal Injury - Medical Malpractice |  | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☒ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General |  |  |  |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 550 Civil Rights |  |  |  |
|  | ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ERISA 29 U.S.C. Section 1132 (a)(3)(B) and 301(a) of Labor Management Relations Act
Brief description of cause:
Action to collect contributions, interest and liquidated damages on delinquent benefit fund contributions.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  05/02/19
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Trustees and Fiduciaries of the Iron Workers District Council (Philadelphia and Vicinity)Benefit and Pension Plan

Address of Defendant: Carson Concrete Corporation

Place of Accident, Incident or Transaction: Philadelphia, Pennsylvania

---

*RELATED CASE, IF ANY:*

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 05/02/2019   Ryan R. Sweeney, Esquire   310140
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☒ 11. All other Federal Question Cases
*(Please specify):* ERISA

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Ryan R. Sweeney, Esquire , counsel of record *or pro se plaintiff*, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☒ Relief other than monetary damages is sought.

DATE: 05/02/19   Ryan R. Sweeney, Esquire   310140
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

CIVIL ACTION

Trustees and Fiduciaries of the Iron Workers       :
District Council (Philadelphia and Vicinity) Benefit :
and Pension Plans, et al.                          :
                            vs.                    :
Carson Concrete Corporation                        :       NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.       (X)

| 05/02/19 | Ryan R. Sweeney, Esquire | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-735-9099 | 215-640-3201 | rsweeney@cjtlaw.org |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRUSTEES AND FIDUCIARIES of the | : | **CIVIL ACTION NO.** |
| IRON WORKERS DISTRICT COUNCIL | : | |
| (PHILADELPHIA AND VICINITY) | : | |
| BENEFIT AND PENSION PLANS, | : | |
| IRON WORKERS DISTRICT COUNCIL | : | |
| (PHILADELPHIA AND VICINITY) | : | |
| PENSION PLAN, | : | |
| IRON WORKERS DISTRICT COUNCIL | : | |
| (PHILADELPHIA AND VICINITY) | : | |
| BENEFIT PLAN | : | |
| 2 International Plaza, Suite 102 | : | |
| Philadelphia, PA   19113, | : | |
| | : | |
| and | : | |
| | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 ANNUITY FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 JOINT APPRENTICESHIP | : | |
| FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 VACATION FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 PAC FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 JOB RECOVERY FUND, | : | |
| GENERAL BUILDING CONTRACTORS | : | |
| ASSOCIATION, INC. INDUSTRY | : | |
| ADVANCEMENT FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |
| REINFORCED IRONWORKERS LOCAL | : | |
| UNION NO. 405 IMPACT FUND, | : | |
| INTERNATIONAL ASSOCIATION OF BRIDGE, | : | |
| STRUCTURAL, ORNAMENTAL AND | : | |

REINFORCED IRONWORKERS LOCAL                  :
UNION NO. 405 BENEFIT/DISABILITY FUND,        :
INTERNATIONAL ASSOCIATION OF BRIDGE,          :
STRUCTURAL, ORNAMENTAL AND                    :
REINFORCED IRONWORKERS LOCAL 405              :
2433 Reed Street                              :
Philadelphia, PA  19146,                      :
                              *Plaintiffs,*   :
                                              :
v.                                            :
                                              :
CARSON CONCRETE CORPORATION                   :
5 Creek Parkway                               :
Boothwyn, PA 19061                            :
                              *Defendants.*   :

---

# **COMPLAINT**

The Trustees and Fiduciaries ("District Council Trustees") for, on behalf of, and along with the Iron Workers District Council (Philadelphia and Vicinity) Pension Fund ("Pension Fund") and Iron Workers District Council (Philadelphia and Vicinity) Benefit Fund ("Health Fund") ("District Council Trustees," "Pension Fund," and "Health Fund" collectively referred to as "District Council Plaintiffs,"), and the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Worker's Local 405 ("Local 405"), International Association of Bridge, Structural, Ornamental and Reinforcing Iron Worker's Local 405 Annuity Fund ("405 Annuity Fund"), International Association of Bridge, Structural, Ornamental and Reinforcing Iron Worker's Local 405 Joint Apprenticeship Fund ("405 Apprentice Fund"), International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers Local Union No. 405 Vacation Fund ("405 Vacation Fund"), International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers Local Union No. 405 PAC Fund ("405 PAC Fund"), International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers Local Union No. 405 Job Recovery Fund ("405 Job Recovery Fund"), International Association of Bridge, Structural, Ornamental and

2

Reinforced Ironworkers Local Union No. 405 IMPACT Fund ("405 IMPACT Fund"),
International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers Local
Union No. 405 Benefit/Disability Fund ("405 Disability Fund"), and General Building Contractors
Association Inc. Industry Advancement Fund ("405 Industry Advancement Fund") ("Local 405",
"405 Annuity Fund", "405 Apprentice Fund", "405 Vacation Fund", "405 PAC Fund", "405 Job
Recovery Fund", "405 IMPACT Fund", "405 Disability Fund", and "405 Industry Advancement
Fund", collectively the "405 Plaintiffs") for their Complaint herein respectfully allege as follows:

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court is invoked pursuant to §502(a)(3)(B), (d)(1) and (f)
and §4301(a)(1), (b) and (c) of the Employee Retirement Income Security Act (hereinafter
"ERISA"), 29 U.S.C. §§1132 (a)(3)(B), (d)(1) and (f) and §1451(a)(1), (b) and (c), respectively,
and §301(a) of the Labor Management Relations Act ( hereinafter "LMRA"), 29 U.S.C. §185(a).

2.      This Court is one of proper venue under ERISA §§502(e)(2) and 4301(d), 29 U.S.C.
§§1132(e)(2) and 1451(d), because all of the Plaintiffs and the Defendant have offices in
Pennsylvania.


## PARTIES

3.      The Pension Fund, Welfare Fund, 405 Annuity Fund, 405 Vacation Fund, 405
Disability Fund (collectively, "ERISA Plaintiffs") are trust funds established under LMRA,
Section 302(c)(5), 29 U.S.C. § 186(c)(5), and are "multiemployer plans" and "employee benefit
plans" within the meaning of Section 3(1), (2), (3), and (37) of ERISA, 29 U.S.C. § 1002(1), (2),
(3), and (37).

4.      The 405 Job Recovery Fund and 405 Industry Advancement Fund are funds established by Local 405 for the purpose of fostering and advancing the interests of iron workers in the territory of Local 405.

5.      The 405 PAC Fund is a fund established by Local 405 for the purpose of receiving voluntary member contributions to be used for political action.

6.      The 405 Impact Fund is a jointly trusteed cooperative trust fund with federal tax-exempt status under section 501(a) of the Internal Revenue Code, 26 U.S.C. § 501(a), as an exempt organization under Section 501(c)(5) of the Internal Revenue Code.

7.      Local 405 is an unincorporated association commonly referred to as a labor union.

8.      The District Council Trustees are trustees and fiduciaries for the District Council Funds within the meaning of ERISA Section 3(21), 29 U.S.C. §1002(21).  They are authorized to bring this action on behalf the District Council Funds.

9.      The Plaintiffs maintain their principal place of business and are administered from offices listed in the caption, which are located in the Eastern District of Pennsylvania.

10.     Defendant Carson Concrete ("Company") is an employer in an industry affecting commerce within the meaning of 29 U.S.C. §§152(2), (6) and (7), 1002(5), (11) and (12) which maintains the business address listed in the caption.

11.     Defendant Company has signed a series of collective bargaining agreements ("CBA") with Local 405, which is within the jurisdiction of the District Council Funds. The CBA requires Defendant Company to make payment of employee benefit contributions to the Plaintiffs. A true and correct copy of the most recent CBA and signature page is attached hereto as Exhibit A.

12.     Defendant Company also has a contractual obligation to produce upon request to the Plaintiffs all books and records deemed necessary to conduct an audit of the Company's records concerning its obligations to the Plaintiffs.

## CAUSE OF ACTION

13.     The above paragraphs are incorporated herein by reference as though duly set forth at length.

14.     In 2018, the Plaintiffs discovered that Defendant Company had failed to remain current in required employee benefit contributions.

15.     The 405 Job Recovery Fund and Defendant Company had a dispute regarding alleged amounts due and the Defendant Company's contribution history to the Plaintiffs.

16.     Upon information and belief, Defendant Company had a long-standing practice of paying certain individual iron workers "under the table." That is, outside of the practice established by the CBA.

17.     This long-standing practice was discovered by the Plaintiffs in 2018 based on information gathered in the industry.

18.     Upon information and belief, Defendant Company paid certain individual iron workers "off the book" payments directly via cash and check.

19.     Upon information and belief, Defendant Company engaged in this practice to pay the individual ironworkers less than what they were entitled to under the CBA, to defraud the Plaintiffs, as well as, to defraud the government and Internal Revenue Service.

20.     Due to the complicated nature of these allegations, the Plaintiffs recognized that its traditional auditing firm was not equipped to properly audit Defendant Company.

5

21.     Due to the complicated nature of these allegations, the Plaintiffs retained the auditing firm Ernst & Young to perform a complete forensic audit of the Defendant Company.

22.     Via letter dated March 7, 2019, counsel for the Plaintiffs provided notice of the Ernst & Young audit and demanded documentation required to complete the audit. A true and correct copy of the March 7, 2019 correspondence is attached hereto as Exhibit B.

23.     The Defendant Company failed and refused to provide the documentation.

24.     After renewed efforts by the Plaintiffs to obtain the information required for the audit, the Defendant Company provided correspondence on March 14, 2019 that stated: "We will comply with your request of an audit by Ernst & Young at District Council's expense." A true and correct copy of this March 14, 2019 correspondence is attached hereto as Exhibit C.

25.     The Defendant Company continued to fail and refuse to provide the documentation.

26.     Plaintiff's counsel and Defendant Company exchanged electronic mail correspondence on March 20, 21, and 22, 2019 regarding the Ernst & Young audit. It was confirmed that the Plaintiffs would cover Ernst & Young's audit costs. Plaintiff's counsel agreed to provide Defendant Company additional time to contact Ernst & Young and provide all the requested documentation. A true and correct copy of this electronic mail thread is attached hereto as Exhibit D.

27.     Although the Defendant Company did contact Ernst & Young, the Defendant Company continued to fail and refuse to provide the documentation.

26.     By letter dated April 3, 2019, the Plaintiffs, through counsel, again demanded Defendant Company provide the documentation necessary for an audit. A true and correct copy of this April 3, 2019 correspondence is attached here as Exhibit E.

27.     On April 4, 2019, a representative of Defendant Company and Plaintiff's counsel

exchanged electronic mail correspondence in which Plaintiff's counsel reiterated that the requested documentation must be provided. A true and correct copy of this correspondence is attached hereto as Exhibit F.

28.     On April 9, 2019, a representative of Defendant Company informed Plaintiff's counsel that it would only provide documentation that the Defendant Company deemed required and necessary for the audit. A true and correct copy of this correspondence is attached hereto as Exhibit G.

29.     Based on information and belief, Defendant Company informed Ernst & Young that is only retained records for three years and that it would not provide all the requested documentation.

30.     Despite being fully aware of its obligations under *Central States, Southeast and Southwest Area Pension Funds v. Central Transport, Inc.*, 472 U.S. 559 (1985), Defendant Company has made meritless arguments that the CBA limits the rights of the ERISA Plaintiffs to review the necessary documentation in light of credible allegations of fraud by the Defendant Company.

31.     The Defendant Company, who on credible information and belief, has engaged in a massive fraud of not only the Plaintiffs but the United States Government, has failed and refused to provide all the requested documentation necessary to complete the Ernst & Young audit (*emphasis provided*).

32.     Without the information listed in the March 7, 2019 letter, Ernst & Young is unable to complete the audit on behalf of the Plaintiffs.

33.     The Defendant Company's books and financial records are the only method to verify whether the Defendant Company reported the correct hours and made the correct

contributions for the period from January 1, 2013, to the present.

24.     The Defendant Company's financial books and records are in the absolute and exclusive control of the Defendant Company.

25.     The potential hardships to the Defendant Company by an Order requiring the Defendant Company to grant the auditors access are outweighed by the Plaintiffs' interests in assuring that the Defendant Company has fulfilled their contractual and statutory obligations to the Plaintiffs.

26.     There is no adequate remedy at law.

27.     All conditions precedent to equitable relief have been satisfied.

**WHEREFORE**, Plaintiffs ask that the Court:

(1)     Enter an order requiring that the Defendant Company provide the Plaintiffs' auditors access to all necessary information to complete a payroll audit for the period from January 1, 2013, through February 28, 2019;

(2)     Enter an order requiring the Defendant Company to schedule a time for the Plaintiffs' auditors to visit the Defendant Company premises to complete the audit no later than thirty (30) days following the date of entry of the order;

(3)     Retain jurisdiction to enter judgment for any employee benefit contributions found due and owing as a result of the audit;

(4)     Enter judgment in favor of the Plaintiffs and against the Defendant Company for attorneys' fees and costs pursuant to ERISA, 29 U.S.C. Section 1132(g)(2)(D); and

(5)     Grant any other further relief the court finds just and proper.


CLEARY, JOSEM & TRIGIANI, LLP


BY: _____
JOSEPH T. CLEARY, ESQUIRE
RYAN R. SWEENEY. ESQUIRE
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
Date: 5/2/2019                          (215) 735-9099

# EXHIBIT A

# AGREEMENT

between the

## General Building Contractors Association, Inc.

and

## The Concrete Contractors Association, Inc.

and

## Local Union No. 405
of the
International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers
AFL-CIO

Covering the Counties of Philadelphia, Bucks, Montgomery, Chester and Delaware

July 1, 2018 - June 30, 2021



# TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I | Agreement | 1 |
| | | |
| Article II | Recognition | 1 |
| | Section 1. Of the Association | 1 |
| | Section 2. Of the Bargaining Unit1 | 1 |
| | Section 3. Of the Union | 1 |
| | Section 4. Waiver | 1 |
| | | |
| Article III | Purpose of the Agreement | 1 |
| | | |
| Article IV | Legality of Agreement | 2 |
| | Section 1. By Law | 2 |
| | Section 2. By Voidance | 2 |
| | Section 3. Liability | 2 |
| | | |
| Article V | Territorial Jurisdiction | 2 |
| | | |
| Article VI | Term | 2 |
| | | |
| Article VII | Wages, Funds and Collection Thereof | 3 |
| | Section 1. Straight Time Wages | 3 |
| | Section 2. Foreman and General Foreman | 3 |
| | Section 3. Health Fund | 3 |
| | Section 4. Pension Fund | 4 |
| | Section 5. Combination Stamp Plan FringeBenefit Funds | 4 |
| | Section 6. Explanation of Individual Funds | 5 |
| | Section 7. Payments | 8 |
| | | |
| Article VIII | Hours of Work, Overtime and Payment of Wages | 10 |
| | Section 1. Daily Straight Time Hours of Work | 10 |
| | Section 2. Call for Men | 10 |
| | Section 3. Holidays | 10 |
| | Section 4. Overtime | 11 |
| | Section 5. Shift Work | 11 |
| | Section 6. Wage Payments | 11 |
| | Section 7. Bonding | 11 |

Article IX          Working Conditions .................................................12
                    Section 1. Concrete Pours ........................................12
                    Section 2. Continuity of Employment .............................12
                    Section 3. Discrimination........................................12
                    Section 4. Double Jobs...........................................12
                    Section 5. Drinking Water .......................................12
                    Section 6. Material, Sorting, Distributing and Storage Points ..........12
                    Section 7. Piecework ............................................12
                    Section 8. Production Limit ......................................13
                    Section 9. Safety Provision .....................................13
                    Section 10. Tool Shed ...........................................13
                    Section 11. Workers Compensation .................................14
                    Section 12. Work Jurisdiction ...................................14
                    Section 13. Work Out of Territorial Jurisdiction ................14

Article X           Hiring Procedures ...............................................14

Article XI          Rights and Obligations...........................................15
                    Section 1. Business Agent .......................................15
                    Section 2. Job Steward ..........................................15
                    Section 3. Subcontractors........................................16

Article XII         Union Shop Clause................................................16

Article XIII        Assistance to Other Unions ......................................16

Article XIV         Disputes and Procedures .........................................16
                    Section 1. Jurisdictional Disputes ..............................16
                    Section 2. Disputes and Grievances ..............................17
                    Section 3. Strikes and Lockouts .................................17

Article XV          Apprentices .....................................................17

Supplemental Agreement between the Concrete .........................................19
Contractors Association, Inc. and Local Union 405 ...................................21

# ARTICLE I
# AGREEMENT

This Agreement is entered into this first day of July, 2018 by and Between the General Building Contractors Association, Inc., the Concrete Contractors Association, Inc. (hereinafter referred to as the Local Association) and the International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers, AFL-CIO, Local Union 405 (hereinafter referred to as the Union).

# ARTICLE II
# RECOGNITION

Section 1. Of the Association:

All employers affiliated with the bargaining unit (hereinafter referred to as the Association) subsequent to the execution of this Agreement, and who shall work under the Agreement, shall be bound by the provisions of this Agreement as a condition of said affiliation. The Association represents that it is duly authorized by certain of its present members to enter into this Agreement and to bind said members hereto as stated herein. The Union shall be notified within twenty-four hours of affiliation or withdrawal of said employers.  No bound employer may withdraw from this Agreement before the end of its termination date. A list of individual employer members of all the Local Associations who are bound by this Agreement on its effective date is on file at the Association Office.

**Section 2. Of the Bargaining Unit:**

There shall be one bargaining unit for all employers bound by this Agreement for the territorial and work jurisdiction covered herein.  That bargaining unit shall be the General Building Contractors Association, Inc. and The Concrete Contractors Association, Inc. which shall include certain present and future members and employers for whose said Association bargains or which they represent (all hereinafter referred to as employers). The Associations are composed of employers engaged in the field fabrication or erection of ferrous and non-ferrous material coming under the jurisdiction of the International Association of Bridge, Structural, Ornamental and Reinforced Ironworkers.

Section 3. Of the Union:

The Association recognize the Union (Local Union 405) as the exclusive representative for all Ironworkers (hereinafter referred to as employees) performing work within the territorial and work jurisdiction of the Union and of this Agreement.

Section 4. Waiver:

No modification, variation or waiver of any term or provision herein shall be valid unless agreed upon in writing by both the Association and the Union.

# ARTICLE III
# PURPOSE OF AGREEMENT

The purpose of this Agreement is to set out conditions with respect to hour or work, wages, and other conditions of employment under which employees of the employer shall work in the trade. The relationship of the parties is fully and exclusively set forth herein, and by no other means, oral or written. Neither the by-laws nor constitution of the Union shall be binding upon the employer, nor shall anything therein contained, or affect the right of hiring, or the wages, hours, working conditions of said employees of the employer. The general working rules of the International Union shall, however, be binding upon the employer unless specified to the contrary herein.  The aforementioned conditions entered into by collective bargaining are designed to provide:

1

A.      As far as possible, the continuous employment of employees covered herein.

B.      A prevention on strikes and lockouts through peaceful adjustment of disputes and grievances between the Association and the Union, or between the Local Association and the Union.

C.      Stable conditions in the industry, thereby preventing waste and unnecessary avoidable delays and expense.

D.      Building costs as low as possible, consistent with fair wages and conditions; and

E.      The further establishment of the necessary procedures by which these may be accomplished.

## ARTICLE IV
## LEGALITY OF AGREEMENT

Section 1. By Law:
      All applicable regulations, rulings or statutes of any duly qualified governmental body or agency shall govern the provisions of this Agreement, its amendments, changes, interpretations, and every other thing in relation to its operation and enforcement.

Section 2. By Voidance:
      Should any of the terms or provisions of this Agreement be determined to be, or held to be, in contravention of any applicable regulation, ruling or statute of any duly qualified governmental body or agency, any such terms or provisions shall be null and void, without hereby affecting any of the other terms or conditions herein. The parties hereto agree, in the event of such an occurrence, to meet immediately to negotiate and substitute provisions for such terms or provisions rendered or declared illegal or invalid.

Section 3. Liability:
      All bound employers shall, in good faith, live up to all provisions of this Agreement. The liability of bound employers shall be several and not joint.

## ARTICLE V
## TERRITORIAL JURISDICTION

   The territorial jurisdiction of this Agreement shall be the territorial jurisdiction of Local Union No. 405, which extends halfway to the nearest outside local union of the International Association of Bridge, Structural  Ornamental and Reinforced Ironworkers.

## ARTICLE VI
## TERM

   This term of this Agreement, with any amendments hereto made as provided for herein, shall be from July 1, 2018 through June 30, 2021  and from year to year thereafter unless notice of change of termination is given in writing by either party to the other at least four months prior to such anniversary date. The nature of the changes shall be specified in the notice. Any such notice whether for change or termination, shall have the effect of terminating this Agreement on June 30, 2021 or at the end of the current contract year if after June 30, 2021.

## ARTICLE VII
## WAGES, FUNDS AND COLLECTION THEREOF

Section 1. Straight Time, Wages and Benefits:

      July 1, 2018. Journeyman: $1.67 to be divided between base wage rate and benefits.

      July 1, 2019. Journeyman: $1.71 to be divided between base wage rate and benefits.

      July 1, 2020. Journeyman: $1.75 to be divided between base wage rate and benefits.

**GBCA Commerical County Rate.**

      July 1, 2018. Journeyman: $1.62 to be divided between base wage rate and benefits.

      July 1, 2019. Journeyman: $1.65 to be divided between base wage rate and benefits.

      July 1, 2020. Journeyman: $1.69 to be divided between base wage rate and benefits.

Section 2: Foreman and General Foreman:

A.     When two or more employees are employed, one shall be selected by the employer to act as a foreman and shall be paid:

    Effective July 1, 2018: 11% above base wage rate. Said premium shall be considered part of the base rate when it applies. The foreman and general foreman are the only representatives of the employer who shall issue instructions to employees. There shall be no restrictions on the employment of foremen (pushers). The employer may employ as many foremen (pushers) on any piece of work as in his judgment is necessary for the economical, expeditious, and safe handling of same. When an employee employed as a foreman on any job requiring six employees excluding the foreman, it is up to the discretion of the foreman whether or not to work with tools. When a job has stopped working due to weather conditions, the foreman thereon may be sent to another job providing he does not replace another journeyman Reinforced Concrete Ironworker.

B.     When the employer employs more than two foremen on any job, operation, or project, he may employ a general foreman who may supervise the foremen in question and shall be paid 20% above wage base rate. Said premium shall be considered part of the base wage rate when it applies.

C.     Foremen and general foremen shall be paid their straight time base wage rate for holidays specified herein and for all time lost during the regular work week. Employee must remain on the jobsite until the end of the working day to be paid. Employee must also work the day before and the day after a specific holiday to receive hoiday pay.

D.     When an employee works alone on any job and he is required to read drawings, provided he is qualified to read same, he shall receive foremen's wages. Said employee shall also be paid his straight time base wage rate for the holidays specified herein and for all time lost during the regular work week on jobs of thirty (30) or more days duration after said employee has been employed on such job for ten (10) consecutive days. On jobs of thirty (30) days or less, the employee shall receive $2.00 per hour above the journeyman's rate. If said employee works more than thirty (30) days for the same Employer, the employee shall be paid the regular foreman's rate.

Section 3: Health Fund:

A.     Beginning July 1, 2018 and through June 30, 2021, in addition to the base rate, the employer agrees to contribute to the Ironworkers District Council (Philadelphia and vicinity) Benefit Fund $9.45 for each hour paid to his employees who are working under this Agreement, whether or not such employees are members of Local 405, overtime hours to be paid at the straight time rate of $9.45 and increases of .25¢ per hour per contract year. In calculation contributions, all fractions of hours shall be paid by carrying all fractions of hours paid during the period covered by the Contributions Report and totaled as of the last day of such report and rounded off to the next highest number of hours. These calculations shall be done on each man separately covered by such report. Overtime hours shall be paid at the straight time rate of $9.45. The fund shall be administered as a Trust, and both the Association and the Union shall be represented by an equal number of Trustees. Employers bound by this Agreement are also bound by any rules or regulations contained in the Trust Agreement governing this Fund, provided that such Trust Agreement rules and

regulations shall not be inconsistent with this Agreement. Payments should be made in accordance with Article VII, Section 5 beginning July 1, 2018 until June 30, 2021, when the Health Fun Contributions may be increased. Any full time employee will have contributions made by his employer to the Health Benefit Fund at 40 hours per week or actual hours paid whichever is greater. When in the future the Ironworkers District Council (Philadelphia and Vicinity) Welfare Fund decides to collect funds for the Welfare Fund on a voucher system, an addendum will be a added to the Agreement. (Overtime hours to be paid at the straight time rate.)

B. In the event that the employer performs work outside the geographical jurisdiction of the Local Union herein, but within the geographical juris- diction of Local Unions affiliated with the Ironworkers District Council of Philadelphia and Vicinity, then the employer agrees to be bound by the terms and conditions pertaining to fringe benefit contributions contained in collective bargaining agreements entered into between all Local Unions affiliated with the District Council and Employers of Ironworkers affiliated with the District Council.

Section 4. Pension Fund:

A. Beginning July 1, 2018 and through June 30, 2021, in addition to the base wage rate. The employer agrees to contribute to the Ironworkers District Council(Philadelphia and Vicinity) Pension Fund $12.55 for each hour paid and increases "as needed" per contract year, to his employees who are working under this Agreement, whether or not such employees are members of Local Union 405. In calculating contributions, all fractions of hours shall be paid by carrying all fractions of hours during the period covered by the Contributions Report and totaled as of the last day of such report and rounded off to the next highest number of hours. These calculations shall be done on each man separately covered by such report. Overtime hours shall be paid at the straight time rate of $12.55 beginning July 1, 2018 until June 30, 2021. The Fund shall be administered as a Trust, and both the Association and the Union shall be represented by an equal number of Trustees. Employers bound by this Agreement are also bound to any rules or regulations contained in the Trust Agreement, unless said rules and regulations are inconsistent with the Agreement.

B. Any full time employee will have contributions made by his employer to the Pension Fund at forty (40) hours a week or actual hours paid; whichever is greater. When in the future, Ironworkers District Council (Philadelphia and Vicinity) Pension Fund decides to collect funds for the pension fund on a voucher system, an addendum will be added to the Agreement. (Overtime hours to be paid at the straight time rate.) Payments shall be made in accordance with Article VII, Section 5.

In the event that the employer performs work outside the geographical jurisdiction of Local Union herein, but within the geographical jurisdiction of Local Unions affiliated with the Ironworkers District Council (Philadelphia and Vicinity), then the employer agrees to be bound by the terms and conditions pertaining to fringe benefit contributions contained in the Collective Bargaining Agreements entered into between all Local Unions affiliated with the District Council and firms employing Ironworkers affiliated with the District Council.

Section 5. Combination Voucher Plan, Fringe Benefit Funds:

In accordance with the Agreement between the General Building Contractors Association, Inc., The Concrete Contractors Association, Inc., (Employer bargaining agent for the industry in the jurisdiction of Local Union 405, Philadelphia, PA) and Ironworkers Local Union #405, Fringe Benefit Fund contributions shall be made through a "Combined Voucher Plan" for all work performed under the jurisdiction of Ironworkers Local Union #405.

A.   The fringe benefits included in this Combined Voucher Plan are as follows: Ironworkers Local Union #405 Annuity Fund, Ironworkers Local Union #405 Working Assessment, Ironworkers Local Union #405 Apprentice Fund, Ironworkers Local Union #405 Vacation Fund, Ironworkers Local 405 Political Action Committee Fund, International Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program.

B.   It has been agreed by the employers that these vouchers will be purchased by each employer, from the Local Union office and distributed to all employees covered by HOURS PAID. Thus, the voucher which included Annuity, Apprentice, Vacation, Working Assessment, Political Action Committee, International Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program will be calculated at the time and one half for hours worked (Saturdays are time and one half, Sundays and holidays are double time) after the eight hour day. Deductions will be taken out of voucher at time and one half and double time respectively.

Section 6. Explanation of Individual Funds:

A.   Annuity Fund. Effective July 1, 2018, in addition to the base wage rate, the employer has agreed to pay $7.00 towards an Annuity Fund for each hour paid to his employees working under this Agreement, whether or not such employees are members of Local 405. Such contributions shall be used in combination with the Apprentice, Vacation, PAC, International Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of the Ironworkers Local Union 405 who signed and delivered to the Union the proper legal action for said deductions. This fund shall be administered as a trust, and both the Local Association and the Union shall be represented by an equal number of trustees. Employers bound by this Agreement are also bound by any rules or regulations    contained in the trust Agreement governing this Fund, provided that such Trust Agreement Rules and Regulations shall not be inconsistent with this Agreement.

B.   Working Assessment Fund. Effectively July 1, 2018, in addition to the base rate, the employer has agreed to contribute to the Working Assessment Fund 6% of gross wages for each employee working under this Agreement, whether or not such employees are members of Local Union 405. Such deductions shall be used in combination with the Agreement, Annuity, Apprentice, Vacation, PAC, International Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of the Ironworkers Local Union 405 who signed and delivered to the Union the proper legal action for said deductions.

C.   Joint Apprenticeship Fund. Effective July 1, 2018, in addition to the base wage rate, the employer has agreed to contribute $1.00 per hour for each employee working under this Agreement, whether or not employees are members of Local Union 405. Said contributions shall be used in combination with the Annuity, Vacation, PAC, Work Assessment, International Funds, Job Recovery Fund and District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union, and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Local Union 405.

5

D.      Vacation Fund. Effective July 1, 2018, in addition to the base wage rate, the employer has agreed to deduct to the Vacation Fund $0.00 per hour for each employee working under this Agreement, whether or not such employees are members of Local Union 405. Said deductions shall be used in combination with the Annuity, Work Assessment, Apprentice, PAC, International Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Ironworkers Local 405, who signed and delivered to the Union the proper legal action for said deductions. Subject to future changes.

E.      International Fund. Effective July 1, 2018, in addition to the base wage rate, the employer has agreed to deduct into the International Fund (I.P.A.L.), .02¢ per hour for each employee working under this Agreement, whether or not such employees are members of Local Union 405. Said deductions shall be used in combination with the Annuity, Work Assessment, Vacation, PAC, Apprentice Funds, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union, and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Ironworkers Local Union 405, who signed and delivered to the Union the proper legal action for said deductions.

F.      Political Action Committee Fund. Effective July 1, 2018, in addition to the base wage rate, the employer has agreed to deduct into the Political Action Committee Fund, .25¢ per hour for each employee working under this Agreement.  Such deductions shall be used in combination with the Annuity, Apprentice, Working Assessment, Vacation, International Fund, Job Recovery Fund, District Council Check Off, I.M.P.A.C.T. Fund, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union, and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Local Union 405 who signed and delivered to the Union the proper legal action for said deductions.

G.      Recovery Fund. Effective July 1, 2018, in addition to the base rate, the employer has agreed to deduct into the Job Recovery Fund $1.25 per hour for each employee working under this Agreement. Such deductions shall be used in combination with the Annuity, Apprentice, Working Assessment, Vacation, Pac, Job Recovery Fund,  I.M.P.A.C.T. Fund and Benefit/Disability Fund for the purchase of vouchers by the employer, from the Union, and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Local Union 405 who signed and delivered to the Union the proper legal action for said deductions. The parties agree that, effective July 1, 2018 and ending January 30, 2021 for targeted work, concrete only, performed within Philadelphia County: Work weeks consist of 5-8 hour days (which shall be Monday through Friday) may be used Saturday as a make up day. Work weeks consisting of 4-10 hour days (which shall be Monday through Thursday) may be used Friday and Saturday as a make up day. For Bucks, Chester, Delaware and Montgomery Counties: Work weeks consist of 5-8 hour days (which shall be Monday through Friday) may be used Saturday as a make up day. Work weeks consisting of 4-10 hour days (which shall be Monday through Thursday) may be used Friday and Saturday as a make up day. All work after 40 hours will be paid at time and one half, except for Sundays and holidays, which shall be paid at double time.  On projects subject to market recovery, an 80% rate package may be used on the total package for bidding purposes. Apprentice ratios to journeyman can be adjusted by agreement. The wage scales or percentages provided in accordance with Local 405's collective bargaining agreement. No shift differential will occur. Implement Impact Drug Testing Policy and or the General Building Contractors Assocation Uniform Drug Policy and Procedures for a drug free work force. Safety training for all workers will include OSHA 30, First Aid CPR training and the NCCCO Rigging and Crane Signalling Certification. Each contractor receiving the rate reduction must sign a Job Recovery Contract and be current in their fringe benefit program.

Local 405 Recovery Fund shall pay to the Internartional Organization Fund, three-eighths (3/8) of 1% of the applicable hourly journeyman wage rate, less vaction benefits, for each hour worked by a 405 member.

County Job Targeting Program

   The Union agrees to administer a market targeting program that wil l be applicable to all projects outside of Philadelphia County. The purpose of this Job Targeting  Program is to enable Employers to fairly and effectively compete for available work on projects outside of Philadelphia County and thereby create job opportunities for  embers of the Union. Any Employer that desires reimbursement from the Union on a job pursuant to this Program  must submit a written application for approval of a job for reimbursement no less than forty-eight (48) hours prior to submitting a bid or proposal for the job; provided that an Employer that is delinquent in its fringe benefit contribution obligations under this Agreement may not apply for or receive reimbursement for any project under this Program. The following information must be included in the application for reimbursement:

• the identity of the job;
• the identity of the general contractor and/or construction manager; and
• the Employer's estimate of the hours of work covered by this Agreement that will be
   required to complete the job.

Within twenty-four (24) hours after an Employer submits a completed written application described above, the Union will confirm to the Employer or Employers that apply for reimbursement with respect to a job that the job has been approved for reimbursement  under this Program ( a "Targeted Job"). The Employer that is successful in obtaining the contract for the Targeted Job shall submit monthly imvoices for reimbursement on a Targeted Job as work is performed and after the Employer has remitted all fringe benefit contributions and other amounts due under this Agreement for the work covered by the reimbursement invoice. The Union shall reimburse the Employer for each hour worked on a Targeted Job at he rates set forth below:

• July 1, 2018 through June 30, 2019 - $0.54 per hour
• July 1, 2019 through June 30, 2020 - $1.10 per hour
• July 1, 2020 through June 30, 2021 - $1.68 per hour

The Union obligation to reimburse an Employer who has been approved for reimbursement with respect to a Targeted Job shall terminate if the Employer becomes delinquent in its fringe benefit contribution obligation with repect to any work covered by this Agreement. In that event, the Union shall be entitled to recover  from the delinquent Employer all reimbursements paid to the Employer from the Employer first became delinquent plus interest.

The Union agrees to notify the Asscoiation of the financial status of its market targeting account upon request.

H.   Ironworkers District Council Per Capita. Effective July 1, 2018, in addition to the base rate, the employer has agreed to deduct into the Ironworkers District Council Per Capita, $.03 per hour for each employee working under this Agreement. Such deductions shall be used in combination with the Annuity, Apprentice, Working Assessment, Vacation, PAC, International Fund, Job Recovery Funds, I.M.P.A.C.T. Funds, Benefit/Disability Fund and Industry Advancement Program for the purchase of vouchers by the employer, from the Union, and said vouchers are to be included in the weekly salary of each employee working under the jurisdiction of Local Union 405 who signed and delivered to the Union the proper legal action for said deductions.

I.   Industry Advancement Program Language. The employer agrees, commencing July 1, 2018, to pay into such fiscal agent selected by the General Building Contractors Association, Inc. a contribution of twenty-five cents ($.25) per hour for each hour worked by each Reinforced Ironworker (including foreman). Contributions shall be subject to increase or decrease as determined by the General Building Contractors Association, Inc.; provided, however, that employers shall notify the Union at least thirty (30) days in advance in writing of any such changes.  The contributions comprising this Fund shall be administered by the  General Building Contractors Association, Inc. and shall be used in a payment of the operating costs of such Association including, but not limited to, the expenses incurred in connection with the promotion of stability of relations between labor and management, the Association's costs of collective bargaining, costs of representation in the adjustment of grievances and  in arbitration, fees of arbitration, secretarial costs, counsel fees, conducting safety campaigns, research programs and such other matters as will be beneficial to the industry at large. No employer or employee shall have any interest, proprietary or otherwise, in said contributions and/or the assets of said Fund.

J.   I.M.P.A.C.T. Fund. In addition to the per hour wage rate, the Employer and the Union shall contribute five-eighths (5/8) of 1% on Journeyman rate less vacation benefits per hour to Ironworkers Management Progressive Action Cooperative Trust (I.M.P.A.C.T.), a jointly trusted cooperative trust with federal tax exemptstatus under section 501 (A) of the Internal Revenue Code as an exempt organization under section 501 (C) (5) of the Internal Revenue Code.Tax exempt status determination was rendered under the initial name of the trust which was the Employers Responsive Educational Cooperation Trust of North America. The general purposes of the trust include the improvement and development of the Ironworker industry through education, training, communication, cooperation and governmental lobbying and legislative initiatives. The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the I.M.P.A.C.T. trust agreement, policies and resolutions. The five-eighths (5/8) of 1% on Journeyman rate less vacation benefits per hour contribution shall be in lieu of any and all contractual requirements for contributions to the National Ironworkers and Employers Apprenticeship Training and Journeymen Upgrading Fund and the Institute of the Ironworking Industry. Said contributions shall be used in combination with Annuity, Apprentice, Vacation, Working Assessment, Political Action, Industry Advancement, Job Recovery, Benefit/Disability Fund and District Council Check Off Funds for the purchase of vouchers by the  Employer from the Union. In addition, the Union and employer agree that by making contributions to I.M.P.A.C.T., each of them may become bound to I.M.P.A.C.T.'S drug and alcohol screening policy and procedure or equivalent program and any amendments or modifications thereto.

The parties agree to amend the Agreement to include the GBCA drug policy and program.

Benefit Fund - The Employer shall deduct $0.10 per hour for each employee working under this agreement to be used for the purchase of disability insurance for all eligible employees.

Section 7. Payments:

    All reports and fund payment required in Article VII are due by the fifteenth day of the month following the period covered by such reports, and shall be accompanied by a common form to be supplied by Local Union 405. Said form shall contain such information concerning the details of the payments and hours worked by covered employees as is necessary for the sound administration and operation of all Funds contained herein. A copy of said common form shall be sent with payments due to each Fund Administrator. Reports and payments received in the office of the appropriate Fund Administrator after the thirtieth day of the month following the period covered are delinquent, and shall be subject to forfeiture of the bond so posted and/or cash deposited for the total amount due the Funds, and in addition shall be subject to a collection charge of ten percent of the amount due to each Fund. When an employer initially becomes delinquent, and should the employer continue delinquent in his reports and payments to the Funds as mentioned herein the Union shall have the right to withhold employees covered by this Agreement from the employer, the no-strike clause of this Agreement notwithstanding except:

A.    No employee shall be withheld from an employer under this Section until: (1) The administrator of the Fund(s) shall have first communicated by certified registered mail with said employer apprising him of the delinquency or arrearages, and (2) In the event the said employer fails to satisfy all his obligations to the Fund(s) shall contact the employer and make arrangements for the immediate payment of all monies due the Fund(s). Copies of the delinquency notification shall be sent by the appropriate administrator to the Union and the Local Association at the same time said notice is sent to the delinquent employer. In the event that the delinquent employer shall not have satisfied his total obligations to the Fund(s) within three working days following the receipt of his delinquency notice from the office of the administrator of the Funds(s) as herein provided, the Union shall have the right to withhold its employees as is more fully set forth herein, and in such event the Union shall not be required to involve or resort to the arbitration procedure specified in this Agreement.

B.    Any employer who has been delinquent as defined herein to any Fund(s) specified herein for two consecutive months shall make payments as specified herein on a weekly basis until such time as the trustees and/or administrators of said Funds(s) are satisfied that said employer can and will make said payments on a monthly basis again without again becoming delinquent. All regulations and rules contained herein, including liquidated damages, strike provisions, and other enforcement actions which would ordinarily apply to a monthly payment shall apply to an employer who must pay weekly except that no written notice of delinquency shall be required once the need for weekly payment has first been established and notice for same given. In the event that the trustees or administrator of any Fund(s) herein deem desirable, the accountants, auditors or authorized representatives are instructed by said trustees to check said records of any employer bound hereto. Such records shall consist of those that may have any bearing whatsoever on hours worked by and hours after the regular quitting time. The overtime premium for the first eight hours on Saturday is time and one-half. All other overtime will be paid at the double time rate, except as provided under shift work. When employees who are employed on such job during the regular work hours whose continuity of employment on such job was interrupted due to job conditions; or when overtime is required on the job, then such employees who have been employed thereon on the last day or days shall not be substituted for by other employees unless such employees are no long on the employer's payroll.

C.    With respect to each of the contribution rates named above, the union will decide on an annual basis the contribution rate for each of the Funds so long as the overall wage and benefit package does not exceed $1.67 for 2018-2019, $1.71 for 2019-2020 and $1.75 for 2020-2021. GBCA County Commercial Rate $1.62 for 2018-2019, $1.65 for 2019-2020 and $1.69 for 2020-2021. The Union will provide Employers a wage/benefit sheet on or before June 30 of each year.

## ARTICLE VIII
## HOURS OF WORK, OVERTIME, AND PAYMENT OF WAGES

Section 1. Daily Straight Time Hours of Work:

Eight hours shall constitute a day's work and such shall be made between 6:00 a.m. and 5:30 p.m., Monday through Friday, unless a different agreement is reached between the employer and the Union, and except in territories where a shorter workday prevails among a majority of the building trades unions on building work. The work day shall be interrupted by a meal period without pay between the third and fifth hour of work. This meal period may be curtailed by agreement between the employer or his representative and the employees on the job. Straight time hours shall not exceed eight in any one day or forty in any one week.

Section 2. Call for Men:

A.  When an employee works on two or more jobs on the same day for the same employer, he shall receive a minimum of eight hours pay unless work is prevented by weather conditions, in which case the employee shall receive pay for the hours that he actually worked. A foreman who works on two or more jobs on the same day shall receive the higher rate of pay for the day.

B.  The employer shall notify each employee before he leaves the job, whether or not he is to return to work the next day, and if so whether to the same job or another job for the same employer. In the event such notice is not given before each employee leaves the job and an employee is not employed on that same job or another job for the same employer the next day, the employee shall have the right to return to the job the next day at the regular reporting time until he is paid off, with a minimum of two hours pay. Such waiting shall not exceed eight hours.

C.  The contractors shall notify the Local Union of new jobs acquired in order to form a joint relationship between contractor and Union and to document work history that is essential to the future of the industry.

D.  It shall be the responsibility of the employer to report all job starts to the Union within 48 hours. If any employer violates this provision or is found to be intentionally cheating or cheating in collusion with his employees the Union shall place a steward on all of the employer's jobs for the remaining term of the Agreement.

E.  When an employee cannot start work due to weather conditions or is not put to work through no fault of his own and is then notified by the contractor to start work, whether his on the job or at home the employee will be paid from starting time for the day or for the hours he actually worked.

Section 3. Holidays:

The following holidays shall be observed and when work is performed thereon it shall be paid for at twice the base wage rate: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Employees shall be off Christmas Eve Day and receive four (4) hours pay. The foreman shall receive a guaranteed eight (8) hours pay for the holiday. Employees who have to work on Christmas Eve Day shall work four (4) hours and be paid for eight (8) hours. Any time worked beyond four(4) hours shall be paid at the double time rate plus the four (4) hour holiday pay. To receive the holiday pay, the employee must work the day before Christmas Eve and the first working day after Christmas Day. In years when Christmas Eve Day falls on a Saturday or Sunday, the four hour provision shall apply to the preceding Friday. There shall be no work performed on Labor Day except to protect or save a life or property. Holidays specified herein which fall on a Sunday shall be observed the following Monday.

## Section 4. Overtime:

All overtime is time and one half (Saturday is time and one half) except for Sundays and holidays, which is double time. Employees will be paid overtime regardless of time started. When employees who are employed on any job during the regular work hours whose continuity of employment on such job was interrupted due to job conditions; or when overtime is required on the job, then such employees who have been employed thereon on the last day or days shall not be substituted for other employees unless such employees are no longer on the employers payroll.

## Section 5. Shift Work:

If the employer so elects, he may work either two or three shifts in a twenty four hour period. When the employer assigns employees to shift work, he shall work them at least five same shift periods except in case of an emergency, said emergence to be approved by the General Executive Board of the International Union.  All shift work shall be between 8:00 a.m. Monday and 8:00 a.m. Saturday. When two shifts are employed, each shift shall work eight hours and shall receive eight hours pay at the straight time base wage rate, or a proportionate part thereof for time worked. When three shifts are employed, each shift shall work eight hours and shall receive eight hours pay at the straight time base wage rate or a proportionate part thereof for time worked. Shift work performed on holidays specified herein. Saturdays, Sundays or beyond the straight time hours shall be paid for at the appropriate overtime rate as specified in Section 4 above, beginning with the first or morning shift.  Notwithstanding, the contents of the aforementioned shift work provisions, the General Executive Board of the International Union may in specific cases, determine the aforementioned provisions shall not apply. In said special cases, the General Executive Board may state the special shift work hours and the payment for such shift work.

## Section 6. Wage Payments:

A.   An itemized statement identifying the employer and showing hours worked, wages earned, and all tax and other deductions shall be listed separately. The employer may withhold three days pay in order to make up the payroll. Employees shall be paid prior to quitting time on the regular pay day, which shall be once a week on such a day as agreed upon between the employer and the Union. All wages and fringe benefit payments shall be made by check, except when the Union has cause to doubt the financial responsibility of the employer. In all such cases, wage payments shall be made in cash. When the employer pays by check and the check is not honored by the employer's bank, the employee shall received an additional two hours pay. When through no fault of their own, employees are not paid by the quitting time on the regular pay day, or when laid off or discharged, the employees check must be dropped off at the business office of Local Union 405 at lay off time or by 12:00 p.m. The employee will be paid waiting time a minimum of 2 hours up to 8 hours a day. Fridays are excluded and the layoff check must be received at Local Union 405's business office by the end of the day on Friday. If an employee is required to go to some other point other than the job to be paid, he shall be paid for the time required to go to such place. Employees who quit on their own accord shall wait to be paid until the next regular pay period.

B.   A day off is up to the discretion of the employee who has the option of a day-off or lay-off.

## Section 7. Bonding:

All employers who are bound by this Agreement shall obtain a payment bond or bonds from a reputable surety company payable to the trustees of the Funds specified in Article VII herein in an amount sufficient to cover the maximum Fund payments for a minimum period of two months, but in no event less than twenty-five thousand dollars in the case of the Welfare and Pension Funds. In lieu of obtaining payment bonds, employers shall have the option of depositing with the trustees of said Funds a like sum of money in cash. The Union shall have the right to require proof of bond coverage or cash deposit. In the event that an employer bound hereto has not posted a bond or a cash deposit in the sum of twenty-five thousand dollars with the Welfare and Pension Fund office as set forth

11

herein, then such employer shall furnish reports and make payments to the Local Union Office on a weekly basis. Should an employer fail to make his weekly remittance as required by Section VII, by the following Monday following the week covered by such reports, such employer shall be deemed delinquent, and Union shall have the right to withhold employees covered in this Agreement from such employer as specified in Article VII, Section 5, herein, but without written notice of delinquency and without regard to arbitration and no strike procedures specified in this Agreement.

<div align="center">

**ARTICLE IX**
**WORKING CONDITIONS**

</div>

Section 1. Concrete Pours:

A.      When concrete is being poured, a Reinforced Concrete Ironworker must be in attendance when conditions require mesh to be raised, dowels or rods to be placed during pouring. Pours are not required to be attended by a Reinforced Concrete Ironworker unless the above conditions are met or any other work is required which is not covered by the Ironworkers of Local Union 405 herein, not by other tradesmen.

B.      On all concrete pours that contain Post-Tension Reinforcement a Certified Reinforced Ironworker must be employed at the jobsite or in close vicinity for safety and any malfunctioning of the Post-Tension standards, anchors or wedges.

Section 2. Continuity of employment:
No employee shall be removed or solicited to leave the employment of an employer bound by this Agreement without consulting that employer, and without this Union immediately replacing the employee.

Section 3. Discrimination:
The parties hereto agree to comply with any and all State and Federal laws, regulations and rules guaranteeing civil rights and liberties to all persons.

Section 4. Double Jobs:
No employee shall be permitted to receive wages for more than one job at the same time.

Section 5. Drinking Water:
The employer shall at all times furnish suitable drinking water in vessels with faucet and individual paper drinking cups for employees working under this Agreement. Ice shall be furnished when necessary.

Section 6. Material, Sorting, Distributing and Storage Points:
The sorting, distributing and handling of all materials coming under the jurisdictional claims of the Union on or about the job or at storage points, shall be performed by employees covered herein, in accordance with International regulations and official decisions.

Section 7. Piecework:
Employees shall not contract, subcontract, work piecework, or work for less than the scale of wages established by this Agreement. The employer shall not offer and/or pay, and employees shall not accept, a bonus based on specific performance of any individual job. The Union prohibits piece- work of any description.

**Section 8. Production Limit:**
There shall be no limitation placed on the amount of work to be performed by an employee covered herein during working hours.

**Section 9. Safety Provisions:**
Employees covered herein shall at all times while in the employment of the Employer be bound by the Employer's safety rules and regulations. In accordance with the requirements of the Construction Safety Act, if applicable, and/or the Occupational Safety and Health Act of 1970, it shall be the sole responsibility of the Employer to ensure the safety of its employees. The Union's involvement with the establishment of the safety and health standards and rules contained herein shall not be used to establish liability on behalf of the Union to any employees or to any other person in the event that injury or accidents occurs at the Employer's worksite.

The safety and health standards and rules contained herein are minimum standards and are not to be interpreted to mean that the Employer does not have the right to establish and impose additional or more stringent standards and/or rules to protect the health and safety of the public, its employees or the employees of its subcontractors and/or suppliers. It shall be the sole responsibility of the Employer to ensure that the Employees covered herein comply with the safety and health standards and rules set forth herein and/or with its safety and regulations. In addition, the following provisions:

A.     Power Equipment: When power equipment is used to unload rebar from the truck to the ground provided all the safety precautions are studied, the following will apply:

      1)    One or more employees will be used when a fork lift, front end loader, bulldozer or backhoe are used.

      2)    A minimum number of employees (2) are needed when a crane or cherry picker is needed or used to off load material from the truck to ground only providing conditions permit the safe use of the crane or cherry picker.

      3)    When a crane or cherry picker is needed to hoist material to an elevation higher than from truck to the ground, four (4) employees are needed, provided there is not a blind spot, if so, a fifth man is needed as a signal man.

B.     Slings:
Steel cable shall be used instead of chains or hemp slings.

C.     Hazardous Waste:
When work is performed by Reinforced Concrete Ironworkers on hazardous waste sites (so determined by Federal, State or others so designated to do so) and the Reinforced Concrete Ironworker is required to wear level a, b, or c personal protection, the Reinforced Concrete Ironworker shall receive his regular hourly wage plus an additional $3.00 per hour.

D.     Reels:
Employees will wear reels to accommodate safe and efficient handling of tie wire and will be considered tool of the trade.

**Section 10. Tool Shed:**
On each job of sufficient size and duration to justify the same, the employer shall provide a room or shed for employees to change their clothes and store their tools. Where possible, the employer shall also provide a tool crib or box on jobs, under lock and key, and losses of such tools and clothing due to theft or fire when the job is not working shall be replaced by the employer, providing that all tools are registered with the employer or foreman, in writing, when taken on the job, and loss claims are registered in writing within twenty-four hours after the occurrence of such loss.

**Section 11. Workers' Compensation:**

The employer shall at all times provide workers' compensation insurance and at the start of every project the contractor must provide the name, address and telephone number of their insurance carrier to the job steward or union hall.

**Section 12. Work Jurisdiction:**

It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the Charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural and Ornamental Ironworkers, and that which is primarily within the recognized and traditional jurisdiction of the Union, it is being understood that such claims are subject to decisions rendered by the Impartial Disputes Board
and as specified in Article XV, Section 1, herein.

**Section 13. Work Outside of Territorial Jurisdiction:**

A.   Employees shipped to jobs or work out of the jurisdiction of the Union shall receive transportation, traveling time and expenses provided they remain on the job thirty days, or until the job is completed if it requires less than thirty days. Employees shipped to a job and not put to work, weather permitting, or if the job is not ready for them to go to work, shall be paid the straight time base wage rate for such time, or such employees shall be shipped back to the shipping point with time and transportation paid by the employer.

B.   Any foreman working in another territory on a holiday and transferred to work in Local Union 405 territory on that holiday shall receive double time wages. Any employee has the option to work in Local Union 405 territory for their straight time base wage rate.

**Section 14. Post-Tensioning Ironworkers:**

Any Ironworkers involved in stressing, cutting or repairing of Post-Tension cables in the jurisdiction of Local Union 405 must have ANSI, Post-Tensioning Ironworkers Certification in order to work on Post-Tensioning projects.

## ARTICLE X
## HIRING PROCEDURES

When additional employees are required to augment the working force of the employer, they shall be secured through Local Union 405's business office. In order to maintain an efficient system of production in the industry, to provide for an orderly procedure of referral of applicants for employment, and to preserve the legitimate interest of employees in their employment, the employer and Local Union 405 agree to the following plan of referral of applicants for employment.

A.   The employer shall have the right to employ directly a minimum number of employees to consist of superintendents, general foremen and foremen. When the employer employs superintendents, general foremen or foremen, either directly or upon request, the employer shall notify the Union office within twenty-four hours of employment.

B.   An Employer may recall any former employee through the Local 405 referral system without regard to his or herplace on the referral list, provided that, an Employer may not exercise this recall right with respect to a former employee who was subsequently employed by another Employer until that individual has been on the referral list for at least 5 consecutive days. The former employee who was being "recalled" shall have the right to accept or reject such employment.

C.   Local Union 405 shall select and refer applicants for employment without discrimination against such applicants for reasons of age, color, creed, national origin, race, sex, Union membership; and such selections and referrals not be affected in any way by by-laws, constitutional provisions, regulations, rules or any other aspect of obligation of Union membership policies or requirements.

14

D.  No employee shall be hired or assigned to a job on a temporary basis and then laid off or sent home during the same day while work is still available. This shall mean that all employees reporting for work on a job shall continue working until such time as the work has been finished. Upon initial assignment, an employee's first working shift for that work assignment, employee shall receive (8) eight hours of pay; unless employee is being brought into an existing working crew and that shift ends prior to (8) eight hours worked due to completion of the required tasks. In this case. the employee shall be compensated for actual hours worked. In the event of inclement weather and /or equipment failure preventing the employee from starting and working their shift, and only case of initial assignment and the employee's first working shift for that assignment, the employee shall receive a minimum of (2) two hours pay.  If an employee is hired or assigned to a job and it is determined that they cannot perform the required tasks associated with the project, the employer shall notify the union and the employee shall be referred back to Local Union 405's referral system; and the employee shall receive a minimum of (2) two hours of pay.  The employee shall be returned to the Local Union 405's referral list at their previous position. This provision shall not apply when remaining work for any such day is limited to the installation of dowels and/or realigning or reinforcing steel or wire mesh while concrete is being poured. When employees are retained for the purpose of setting dowels and realigning or reinforcing steel and wire mesh, the job foreman and/or job steward shall remain to perform this work. This shall not prevent the discharge of employees for proper cause.

E.  Any applicant for employment shall have the right to refuse to accept an employment opportunity presented to him. Any applicant who rejects two (2) consecutive employment opportunities shall be placed at the bottom of the referral list. Employers shall call Local Union 405 between the hours of 6:00 a.m. and 4:00 p.m., Monday through Friday for employees needed for the next working day.

F.  When an applicant is referred for employment and then quits such employment, he shall be placed at the bottom of the referral list. In the  event that an applicant for referral does not show up for a job opportunity within thirty continuous work days, his name shall then be removed from the referral list unless he is ill or injured.

G.  Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Joint Apprenticeship Agreement between the Local Association and Local Union 405 and the standards filed with the Bureau of Apprenticeship Training.

H.  If Local Union 405 fails to refer applicants within a forty-eight hour period after being notified, the employer shall have the right to employ employees directly. The employer shall notify the Union within twenty-four hours of employment of such employees.

I.  A copy of this Agreement shall be made available to any job applicant at the Local Union office upon request.

## ARTICLE XI
## RIGHTS AND OBLIGATIONS

Section 1. Business Agent:

The Business Agent of the Union shall have access to all jobs ove which the employer exercises control of entry, shall fully comply with safety, security, and visitor rules established for the project and shall not interfere with the work of employees on the job.

**Section 2. Job Steward:**

There shall be a steward on each job who shall be appointed by the business agent. He shall keep a record of workers laid off and discharged and take up all grievances on the job and try to have same adjusted. In the event he cannot adjust them, he must promptly report that fact to the business agent, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work. He shall see that the provisions of the General Working Rules of the International Association of Bridge, Structural, Ornamental Ironworkers and Reinforced Ironworkers are complied with and report to the Union the true conditions and facts. The steward shall promptly take care of injured workers and accompany them to their homes or to a hospital, as the case may require, without any loss of time and report the injury to the proper officers of the Union. The steward shall not have the authority to cause a work stoppage on any job of a fair employer. A steward failing to fulfill his duties shall be subject to censure by his Union, and also subject to a penalty upon conviction on charges provided in the International Constitution. The employer agrees that the job steward will not be discharged until after proper notification has been given to the Union and, further, when employees are laid off, the job steward shall be the last employee laid off other than the foreman. The standard interpretation of the Steward's Clause of the General Working Rules of the International Association of Bridge, Structural and Ornamental Ironworkers is that the business agent shall appoint one working steward from among the employees on the job.

**Section 3. Subcontractors:**

The employer agrees that he shall not enter into any sub-contract or engage the services of any subcontractor who refused or fails to agree to observe all of the conditions or employment established by this Agreement.

## ARTICLE XII
## UNION SHOP CLAUSE

All employees who are members of the International Association of Bridge, Structural and Ornamental Ironworkers on the effective date of this Agreement shall be required to remain members of the Union in good standing as a condition of employment during the term of this Agreement. All employees shall be required to become and remain members of the Union in good standing as a condition of employment from and after the seventh day following the date of their employment, or the effective date of the Agreement, whichever is later.

## ARTICLE XIII
## ASSISTANCE TO OTHER UNIONS

This Agreement does not deny to the Union or its representatives any right which may be permitted to them under the existing laws to render assistance to other labor organizations by lawful removal of its members from jobs when necessary and proper to protect the interests and security of such labor organizations. No removal shall take place, however, until such action has first been approved by the General Executive Board of the International Union, and until notice is first given to the employer involved.

## ARTICLE XIV
## DISPUTES AND PROCEDURES

**Section 1. Jurisdictional Disputes:**

It is agreed between the parties hereto that this Agreement is applicable to construction work that is primarily within the recognized and traditional jurisdiction of the Union, and said work shall be performed in accordance with the terms of this Agreement. It is further agreed that should an employer bound hereto be required to perform construction work that is within the recognized and traditional jurisdiction of another Union, or which work

is claimed by another Union, the work assignments shall be made in accordance with and shall be subject to agreements and decisions of record recognized by the Building Trades Department, AFL- CIO, established trade practice, or prevailing area practice, with due regard, however to the efficiency and economy of operations. If the Union is still aggrieved over any assignment after discussion between the employer and the Business Agent(s) of the Union(s) involved, an attempt shall be made to settle the dispute by discussion between the Business Agent(s) of the Union(s) involved and the Director of Labor Relations of the Local Association. If such discussion does not result in a prompt settlement of the dispute, the matter shall then be referred to the Impartial Jurisdictional Disputes Board and Appeals Board. If the matter is not resolved in this matter, the parties involved may then agree to select an impartial third party as provided in Section 2, below. Pending an orderly resolution of the matter, there shall be no interruption of work by a work stoppage, strike, or refusal to refer men to the project by the Union.

Section 2. Disputes and Grievances:

The following shall be the procedures to be followed with respect to all disputes of any nature whatsoever (except jurisdictional disputes as provided in Section 1 above except any disputes arising under Article VI above) which may arise between the parties hereto or their individual members involving the interpretation or application of this Agreement during its term.

A.   If the disputes affect, or arise on, a particular job or operation, an attempt shall be made to settle it by discussion between the foreman and/or operation and/or the Union's Business Agent.

B.   If the discussion provided for in paragraph (A) above does not result in a prompt settlement of the dispute, or if the dispute affects or involves more than one job or operation, an attempt shall be made to settle the dispute by discussion between the Business Agent of the Local Union and the Director of Labor Relations of the Local Union Association. If such discussion does not result in a prompt settlement of the dispute and either the Local Association or the Union desires further action respecting such dispute, such further action shall be arbitrated in the manner hereinafter set forth.

C.   The Local Association or the Union, whichever decides, then shall be further action on the dispute, shall notify the other in writing by registered mail of its intentions to submit the dispute to arbitration, and shall, simultaneously, file with the American Arbitration Association, a written demand for arbitration of said dispute, whereupon an arbitrator shall be appointed in accordance with the then prevailing rules of Labor Arbitration Tribunal of said American Arbitration Association, except that if the parties hereto fail to agree upon any of the persons named in the first submitted list by the American Arbitration Association to the parties, or if those name in said list decline or are unable to act, and if for any reasons the appointment cannot be named from such first submitted list. The American Arbitration Association shall send a second list of names of persons chosen from its Panel, and thereafter proceed in accordance with its rules aforesaid. The arbitrator thus appointed shall hold hearings as promptly as possible and shall render his award in writing. Such award shall be final and binding upon the Local Association and the Union and upon their respective principals or members. In considering his award, the arbitrator shall not modify, detract from or alter the provisions of this Agreement. The arbitrator's fees and expenses and the fees of the American Arbitration Association shall be shared equally by the Local Association and the Union. No disagreement, dispute or questions shall result in any slow down, stoppage, strike, abandonment or lockout pending the completion of all procedures, including arbitration, provided for in this Agreement or Article.

Section 3. Strikes and Lockouts:

It is agreed that there shall be no slowdown, strikes or work stoppages of any character whatsoever by the Union or its members, either individually r collectively, and that there shall be no lockouts by the Local Association during the terms of this Agreement. This provision shall not apply, however should either party hereto refuse to abide by any decision or order rendere by the Impartial Jurisdictional Disputes Board or Appeals Board; to submit any matter or arbitration as provided for herein; or when the Union has been advised by the administrator to any Fund specified herein that an employer is delinquent as specified herein.

## ARTICLE XV
## APPRENTICES

Recognizing the need to maintain continuing support of apprenticeship and similar training programs in the Construction Industry, the employer shall, to the extent permitted by job conditions, employ from the Union and which is within his capability all apprentices. The apprentices shall come under the jurisdiction of the Union and the Joint Apprenticeship Committee and shall abide by the apprenticeship standards of said Committee. All apprentices shall work under the supervision of working journeymen. Both the Local Association and the Union shall have an equal number of representatives on the Joint Apprenticeship Committee. The length of the apprenticeship program shall be three years and the apprentice compensation is as follows:

| | | |
|---|---|---|
| 1st Year: | 65% of base wage rate |
| 2nd Year: | 80% of base wage rate |
| 3rd Year: | 95% of base wage rate |

The apprenticeship ratio shall be 1 (one) apprentice to 4(four) journeymen. The apprentice to journeymen ratio and/or wage scale or percentages may be different from the ratio and/or wage scales or percentages specified herein to the extent provided, permitted or required applicable by and international project agreement. The ratios and/or wage scales or percentages provided in such an agreement shall be applicable in accordance with such agreement when certified by either the International Union or the applicable local union.  Apprentices are not permitted to work outside of the territory of the Ironworkers District Council of Philadelphia.

The following is a Supplemental Agreement between The Concrete Contractors Association, Inc. and Reinforced Ironworkers Local Union 405.

Article IX, Section 6, The installation, Material Sorting, Distributing, Loading & Unloading (on jobsite) & off Site Storage points shall be expanded to include:

A.     Reinforced Concrete Ironworkers (Rodsetters) shall be employed on installation of all articles made of wire and materials altered in the field such as framing, cutting, bending, burning and welding by acetylene gas and electric machines that are to be used for the purpose of reinforcing concrete.

B.     All work including the welding, tying and fastening of reinforcing bars or wire mesh, whether to each other or to some other form of material (metal) even if not tied, tied connected, welded or otherwise and whose reason is reinforcement and not convenience, shall be done by the Reinforced Concrete Ironworker.

C.     The placing, rolling out, fastening (by any means wire or weld for any  reason) or general installation of all wire mesh or substance termed wire or mesh or mesh in all shapes, sizes, weights, in either sheets or rolls used to reinforce concrete (construction) shall be the work of the Reinforced Concrete Ironworker.

D.     The installing of all wire mesh, mesh or chicken wire on any surface; whether wood, concrete, steel or other materials that will accept or be covered by concrete, gunite, epoxy, fiber or any substance not named herein for the purpose of reinforcement, fireproofing or refractory.

E.     When structural beams or other materials (refer to above) shall be covered by wire mesh or chicken wire for the reception of any substance termed refractory, the covering and fastening or installing of the wire mesh or chicken wire to the structural beam or other material or object shall be the work of the Reinforced Concrete Ironworker.

F.     Setting of dowels, realigning steel (tying or moving), or pulling of wire mesh; on new construction which does not enter into existing structure whether  of building, heavy and highway, residential or commercial work is the work of the Reinforced Concrete Ironworker.

G.   The sorting, distributing and handling of all reinforcing materials, reinforcing bars, wire mesh, welding equipment or all material referring to or aiding in the installation of such, coming under the jurisdictional claims of the Union in or about the job or storage points shall be done by the Reinforced Concrete Ironworkers in accordance with International Regulations, International Agreements and official decisions.

H.   All pre-fabricated mats, columns, beams or walls whether fabricated on job or at another location shall be installed and fabricated by the Reinforced Concrete Ironworker.

I.   Work done on or in shipyards, navy shipyards, reservoirs, water treatment plants, bridges, approaches, government installations, railroads or road work under the category of Heavy & Highway, Residential, Commercial, Building and Industrial.

J.   The maintenance and use of power tools and equipment used in conjunction with the Reinforced Concrete Ironworker trade will be considered tools of the trade. These include, but are not limited to: tieguns, welding machines, fork lifts, man lifts, scissorlifts, handling of hydraulic jacks, power operated or otherwise, reinforcing steel bending machines and stressing machines for post-tensioning or otherwise.

K.   Renovation: The installing of dowels in pre-drilled holes by any means - epoxy compound, tying with wire or any substance to accept rebar or mesh in any size or dimension (chicken wire, 4x4 or such) to be covered by gunite or refractory shall be the work of the Reinforced Concrete Ironworker. This process to be done of abutments, facades or any structure.

L.   The installing of dowels (reinforcing bars) in pre-drilled holes of any material, wood, concrete, etc., or otherwise by any means necessary - epoxy, glue, compound, tying, shall be the work of the Reinforced Concrete Ironworker.

M.   The assembling and erection of all sign structures, the bolting, welding, and bracing with any or all tools necessary.

N.   Fiber Glass Rebar: The loading and unloading, transporting, installing, fabricating, tying, cutting with saw or any tool either manual or powered is the work of the Reinforced Concrete Ironworker.

O.   If two or more trades work on special shifts (same time, same shift) and are functioning as a composite unit, when working overtime on holidays or any of the trades working the Ironworker shall receive double time also. He will also receive the highest wage of the trade working together. Sample: Elevated Wages.

P.   Fabrication, installation and modification of all caissons (whether called piles or cages) of any length or size shall be the work of the Reinforced Concrete Ironworker on buildings, heavy and highway, residential, industrial or commercial.

Post Tensioning & Pre-Stressing Materials:

1. Installation

   a.) Cables - The installing and stressing of all vertical and horizontal cables in construction and masonry walls. Even if these walls don't need mortar or caulk in some cases. The installing of line or stressing in grease caps at the end of cable, or any purchase, in essence, waterproofing, etc.

2. Fabrication

    a.) The splicing, extending, fastening, taping, shortening, or altering of any kind by use of torch or power equipment or other means for any reason shall be the work of the Certified Reinforced Concrete Ironworker.

    b.) Distributing of objects or material of any kind which aid or are necessary for the installation and stressing of cables shall be the work of the Certified Reinforced Concrete Ironworkers.

    c.) The complete installation of anchors, dead ends, or wedges on all cables that come to the job sites without them, no matter what the reason shall be the work of the Certified Reinforced Concrete Ironworker.

    d.) The cleaning or removing of grease or substances from the cable by any means and with any material or solvent shall be the work of the Certified Reinforced Concrete Ironworker.

3. Transporting on Jobsite

    a.) The loading, unloading, hoisting or lowering and moving by hand or by any form of power equipment or limited movement shall be the work or the Certified Reinforced Concrete Ironworker.

4. Wedging

    a.) The installing of wedges or any kind of material to the cable and anchors and dead ends for the purpose of, and as part of the stressing for the purpose of, and as part of the stressing (pulling) operations shall be the work of the Certified Reinforced Concrete Ironworker.

5. Securing Anchors

    a.) The installing or fastening of the anchors, dead ends, and/or devices to any structure or form of any type dead end and/or other devices shall be the work of the Certified Reinforced Concrete Ironworker.

6. Pre-Stressing & Post Tensioning

    a.) The stressing or pulling of the cable by mechanical equipment (hydraulic or otherwise) or any other means shall be the work of the Certified Reinforced Concrete Ironworker.

7. De-Tensioning, Lift-Off's of Modifications

    a.) Any type or modifications to a tendon or tendons (multi-strand) are to be performed by a Certified Reinforced Ironworker.

8. Barrier Cables

    a.) The installation of tendons, anchors, barrel anchors, slotted Bearing plates wedges and turn buckles and any stressing or back stressing to be performed with any type of hand tools, or power equipment (rams, compressors, pocket shears) are to be performed by the Certified Reinforced Ironworker.

9. Certifications

    a.) Certifications are now required to install all anchors, tendons, all back-up reinforcement, stressing, modifications to all part of the post-tensioning system. The total system is from one tip of the tendon tail to the other and all equipment in between those tails, including all stressing and finishing off all tendon tails with the placement of all types of end caps. This work shall be done by a Certified Reinforced Ironworker.

## ACCEPTANCE OF AGREEMENT

Association and Non-Association Employers' Acceptance
of the Agreement between the

General Building Contractors Association, Inc.
Concrete Contractors Association, Inc.

and

Reinforced Ironworkers Local Union 405

The undersigned employer approves, ratifies and agrees to be legally
bound by all of the provisions of the foregoing Agreement made by the
Employer Associations and Reinforced Ironworkers Local Union 405

Dated this _____14TH_____ day of ___August___, 2018

## FOR THE EMPLOYER

Firm _____CARSON CONCRETE CORPORATION_____

Address _____5 CREEK PARKWAY_____

City, State ___BOOTHWYN, PA___ Zip __19061__

Phone __610-494-7700__

Signature for the company _____
(Officer, Owner, Partner)

(Title) _____

Date __8-14-2018__

Printed name of above __ANTHONY J. SAMANGO, JR.__
(Officer, Owner, Partner)

(Title) __OFFICER__

### FOR THE UNION

_____  B.A.
(Officer, President or Business Agent)   (Title)

Date __8/6/18__

21

IN WITNESS WHEREOF, the parties hereto have on the first day of
July 2018 set their hands and seals

GENERAL BUILDING CONTRACTORS ASSOCIATION

BY

_____
JOESEPH MERLINO

CONCRETE CONTRACTORS ASSOCIATION

BY

_____
FRANCIS PIETRINI

LOCAL UNION 405
OF THE
INTERNATIONAL ASSOCIATION OF
BRIDGE, STRUCTURAL, ORNAMENTAL AND
REINFORCING IRONWORKERS

BY

_____
SAMUEL MALONE, BUSINESS MANAGER/FS-T

22

# EXHIBIT B



CLEARY,
JOSEM &
TRIGIANI

CLEARY, JOSEM & TRIGIANI LLP
Constitution Place
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
215.735.9099
Fax: 215.640.3201
www.cjtlaw.org
E-Mail: labor@cjtlaw.org

*Ryan R. Sweeney, Esquire*
*Email: rsweeney@cjtlaw.org*
*Admitted in PA & NJ*

March 7, 2019

*Via Certified Mail/Return Receipt Requested*
*Regular First Class Mail and*
*Overnight Mail and*
*Electronic Mail tsamango@carsonconcrete.net*

Anthony Samango, Jr.
Carson Concrete Corporation
5 Creek Parkway
Boothwyn, PA  19061

RE:   **Iron Workers Local Union 405 and Carson Concrete Corporation**
      **Reinforced Iron Workers Local Union No. 405 Job Recovery Program**

Dear Mr. Samango:

I am in receipt of your February 8, 2019 email correspondence in which you again assert that Carson Concrete Corporation ("Employer") is not a delinquent contractor. Based on your assertions, I have performed a through review of your file. As detailed herein, the Employer is delinquent to both the Iron Workers Local 405 Benefit Funds ("405 Funds") and the Iron Workers District Council (Philadelphia and Vicinity) Benefit Funds ("District Council Funds") (collectively, "Funds"). Further, the Funds have received credible information that this delinquency may be greater based on payroll and employment practices of the Employer. At this time, it is imperative that you submit to an audit by Ernst & Young, LLP. so that we can work to amicably resolve these outstanding issues.

As a preliminary matter, the audit performed by Fischer Dorwart, P.C. clearly establishes that the Employer is delinquent to both Funds for the period of January 1, 2016 through November 30, 2018 ("audit period"). I refer you to Attachment A to this correspondence. This document summarizes Fischer Dorwart, P.C.'s audit results related to the District Council Funds for the audit period based on information then available to the District Council Funds. The Employer owes the District Council Funds at least **$15,363.26** in past due interest and **$42,835.86** in liquidated damages. As you can see from the document, the District Council Funds acknowledge and factor in the settlement the Employer reached with Jeremy Meyer, Esq. of this office. Based on recently obtained information, it is the position of the District Council Funds that this amount due for the audit period may increase.

Anthony Samango, Jr.
March 7, 2019
Page 2

I now refer you to Attachment B. This document summarizes Fischer Dorwart, P.C.'s audit results related to the 405 Funds for the audit period. The Employer owes at least **$25,202.83** in interest and **$60,286.95** in liquidated damages. Based on recently obtained information, it is the position of the District Council Funds that this amount due for the audit period may increase.

**As the Employer is patently delinquent, the Reinforced Iron Workers Local Union No. 405 Job Recovery Program ("Program") will not be distributing funding at this time.** In your February 8, 2019 correspondence, you note that the Program approved the Employer to participate in the Program on January 31, 2018. The delinquencies uncovered by Fischer Dorwart, P.C. pre-date that January 31, 2018 approval. The Program rules explicitly preclude a delinquent employer from participating in the Program.

You have repeatedly insisted that the Employer is not delinquent. Further, it is my understanding that you challenge our position that additional information has been made available to the Funds related to the Employer's payroll and employment practices that may increase this delinquency. Thus, the Funds now collectively demand the Employer participate in an audit by Ernst & Young, LLP. so that these matters can be clarified and amicably resolved.

Please immediately contact John Roberts of Ernst & Young, LLP. to schedule an audit for the period of January 1, 2013 through February 28, 2019. The following documents from this January 1, 2013 through February 28, 2019 must be made available for inspection:

    a. List of all entities under common control of the Employer, that have entered a joint venture with the Employer, or share one or more shareholder of the Employer <u>and</u> have employed members of Iron Workers Local 405;

    b. Ownership information on each entity, including the Employer, as well as organizational charts and the identity of personnel in supervisory positions;

    c. Chart of Accounts for each entity, including the Employer;

    d. Trial Balances and General Ledger detail for all accounts, for each entity, including the Employer;

    e. Cash Receipts and Disbursement Journals for each entity, including the Employer;

    f. Bank statements, cancelled checks, check registers, and cash reconciliations for each entity, including the Employer;

    g. Bids, awards, and contracts for each entity, including the Employer, that employed members of Iron Workers Local 405; and

    h. A listing of any and all payments (payroll, expense reimbursement and/or miscellaneous) made to any member of Iron Workers Local 405 made by any entity, including the Employer;

    i. A list of all projects and jobs by location and name on which the Employer performed work from January 1, 2013 through February 28, 2019;

    j. A classification for all employees on the payroll registers of the Employer during the audit period;

Anthony Samango, Jr.
March 7, 2019
Page 3

    k. The Forms W-3, 1096, and 1099 issued to all employees, subcontractors and
       vendors and the invoices supporting the 1099s;

    l. The quarterly Form 941s;

    m. The quarterly Form UC-27s, including all attachments;

    n. The corporate tax returns IRS 1120;

    o. Remittance reports submitted by the Employer to any other trade during the audit
       period; and

    p. The sales journals, sub-contractor agreements and petty cash payments for the
       audit period.

**Please note that if you refuse to cooperate and provide this documentation within 10 days, the Funds will bring a lawsuit against the Employer to compel your cooperation.** In such a lawsuit, the Fund would seek not only an order requiring the Employer to provide access to the books and records necessary for the auditors to conduct the audit, ***but also reimbursement for the Fund's attorneys' fees and costs*** it incurs in such a lawsuit, pursuant to 29 U.S.C. § 1132(g)(2)(D)

We sincerely hope such a lawsuit will not be necessary and you will immediately contact John Roberts, Executive Director, at Ernst & Young One Commerce Square, 2005 Market Street, Suite 700 Philadelphia, PA 19103, (215) 448-5661 and provide the necessary documentation.

Sincerely,

RYAN R. SWEENEY, ESQUIRE

cc:    Steve Sweeney
       John Roberts
       Steve Conley

# EXHIBIT C



March 14, 2019

RE: Iron Workers Local 405

We will comply with your request of an audit by Ernst & Young at District Council's expense.

Sincerely,

Anthony Samango

# EXHIBIT D

**Dana Myers**

| | |
|---|---|
| **From:** | Ryan Sweeney |
| **Sent:** | Friday, March 22, 2019 9:55 AM |
| **To:** | 'T Samango' |
| **Cc:** | Anthony Samango; ssweeney@iwintl.org; William Josem; Joseph Cleary |
| **Subject:** | RE: Carson Audit by Ernst and Young |

| **Tracking:** | Recipient | Read |
|---|---|---|
| | 'T Samango' | |
| | Anthony Samango | |
| | ssweeney@iwintl.org | |
| | William Josem | |
| | Joseph Cleary | Read: 3/22/2019 12:49 PM |

Mr. Samango,

It is agreed that Ernst & Young will only bill their audit costs to the Ironworkers. The Ironworkers will cover these bills from Ernst & Young. As you have ten days from March 14, 2019 to contact Ernst & Young, I expect that you will contact John Roberts today, but no later than Monday.

The Ironworkers – including, but not limited to the Ironworkers Local 405, the Ironworkers Local 405 affiliated funds, and the Ironworkers District Council Funds – maintain and do not waive any positions previously communicated to you, including those in the March 7, 2019 letter.

Ryan Sweeney

**From:** T Samango <tsamango@carsonconcrete.net>
**Sent:** Thursday, March 21, 2019 10:46 AM
**To:** Ryan Sweeney <rsweeney@cjtlaw.org>
**Cc:** Anthony Samango <as@carsonconcrete.net>
**Subject:** Carson Audit by Ernst and Young

Mr. Sweeney,

As you know we agreed to an audit following a meeting with Steve Sweeney on March 14, 2019, it was my understanding that we had 10 days from that date to contact Ernst & Young.

I disregarded your letter dated March 7, 2019 and its content as meritless.

I told Steve we would agree to an audit on the condition that the entire cost of the audit be paid for by The Iron Worker funds. Please confirm in writing that the Iron Workers will pay the entire cost of the audit which seems fair since this will

be the third such audit of some of the years in question.

Anthony J. Samango

**From:** Ryan Sweeney [mailto:rsweeney@cjtlaw.org]
**Sent:** Wednesday, March 20, 2019 4:06 PM
**To:** Anthony Samango
**Cc:** John Roberts; ssweeney@iwintl.org; Joseph Cleary; William Josem
**Subject:** Carson Audit by Ernst and Young

Tony,

As you know, by letter dated March 7, 2019, I notified you of the Local 405 Funds and District Council Funds audit demand. That correspondence is attached to this email. The correspondence notified you to contact John Roberts of Ernst & Young within ten days to provide requested documentation and to schedule the audit. I was informed by Local 405 that you recently agreed with the Local and Local 405 Funds to participate with the audit.

However, as of today's date, you have not contacted Mr. Roberts. Please immediately contact Mr. Roberts at (215) 448-5661. Alternatively, I will institute a lawsuit in the United States District Court for the Eastern District of Pennsylvania to compel the audit and will fully brief the Federal Court as to the current circumstances.

I hope this will be amicably resolved.

Thank you,

Ryan R. Sweeney, Esq.
Cleary, Josem & Trigiani LLP
Constitution Place
325 Chestnut Street, Suite 200
Philadelphia, PA 19106
Telephone: 215.640.3273
Fax: 215.640.3201

Admitted in PA & NJ

---

CONFIDENTIALITY NOTICE:
This e-mail message is intended for the personal use of the recipient(s) named above.  The message may be an attorney-client communication and as such is privileged and confidential.  If you are not an intended recipient, you may not review, copy or distribute this message.  If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE:
To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachment(s)) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

# EXHIBIT E



# CLEARY, JOSEM & TRIGIANI

CLEARY, JOSEM & TRIGIANI LLP
Constitution Place
325 Chestnut Street, Suite 200
Philadelphia, PA  19106
215.735.9099
Fax: 215.640.3201
www.cjtlaw.org
E-Mail: labor@cjtlaw.org

*Ryan R. Sweeney, Esquire*
*Email: rsweeney@cjtlaw.org*
*Admitted in PA & NJ*

April 3, 2019

***Overnight Mail and***
***Electronic Mail tsamango@carsonconcrete.net***

Anthony Samango, Jr.
Carson Concrete Corporation
5 Creek Parkway
Boothwyn, PA   19061

**RE:   Iron Workers Local Union 405 and Carson Concrete Corporation**
**Ernst & Young, LLP. Audit**

Mr. Samango:

Carson Concrete Corporation ("Employer"), as a contributing employer to the Iron Workers Local 405 Benefit Funds ("405 Funds") and the Iron Workers District Council (Philadelphia and Vicinity) Benefit Funds ("District Council Funds") (collectively, "Funds"), has agreed to submit to an audit conducted by Ernst & Young, LLP. However, we have learned that the Employer is failing and refusing to provide all the documentation listed in my March 7, 2019 correspondence.

This is written notice that if the Employer continues to delay or fails to provide the requested documentation, my office will immediately institute a lawsuit in the United States District Court for the Eastern District of Pennsylvania. In such a lawsuit, the Fund would seek not only an order requiring the Employer to provide access to the books and records necessary for the auditors to conduct the audit, *but also reimbursement for the Fund's attorneys' fees and costs* it incurs in such a lawsuit, pursuant to 29 U.S.C. § 1132(g)(2)(D).

We sincerely hope such a lawsuit will not be necessary and you will immediately contact John Roberts, Executive Director, at Ernst & Young One Commerce Square, 2005 Market Street, Suite 700, Philadelphia, PA 19103, (215) 448-5661 and provide the necessary documentation.

The outstanding documentation includes the following records, for the period of January 1, 2013 through February 28, 2019:

Anthony Samango, Jr.
April 3, 2019
Page 2

    a. List of all entities under common control of the Employer, that have entered a joint venture with the Employer, or share one or more shareholder of the Employer <u>and</u> have employed members of Iron Workers Local 405;

    b. Ownership information on each entity, including the Employer, as well as organizational charts and the identity of personnel in supervisory positions;

    c. Chart of Accounts for each entity, including the Employer;

    d. Trial Balances and General Ledger detail for all accounts, for each entity, including the Employer;

    e. Cash Receipts and Disbursement Journals for each entity, including the Employer;

    f. Bank statements, cancelled checks, check registers, and cash reconciliations for each entity, including the Employer;

    g. Bids, awards, and contracts for each entity, including the Employer, that employed members of Iron Workers Local 405; and

    h. A listing of any and all payments (payroll, expense reimbursement and/or miscellaneous) made to any member of Iron Workers Local 405 made by any entity, including the Employer;

    i. A list of all projects and jobs by location and name on which the Employer performed work from January 1, 2013 through February 28, 2019;

    j. A classification for all employees on the payroll registers of the Employer during the audit period;

    k. The Forms W-3, 1096, and 1099 issued to all employees, subcontractors and vendors and the invoices supporting the 1099s;

    l. The quarterly Form 941s;

    m. The quarterly Form UC-27s, including all attachments;

    n. The corporate tax returns IRS 1120;

    o. Remittance reports submitted by the Employer to any other trade during the audit period; and

    p. The sales journals, sub-contractor agreements and petty cash payments for the audit period.

It is our understanding that you have agreed to provide the records under paragraphs e, h, j, l and o by the end of next week. However, you claim that you only maintain records for three years. This violates generally accepted accounting standards and is not authorized by the parties' collective bargaining agreement. We again state that the period of this audit will be for January 1, 2013 through February 28, 2019 and the Employer must provide the records for the full audit period. If I have misunderstood your position, please clarify how long the Employer maintains its records. Further, please immediately contact John Roberts to coordinate the exchange of all the requested documents above.

Anthony Samango, Jr.
April 3, 2019
Page 3

Sincerely,

RYAN R. SWEENEY, ESQUIRE

cc:     Steve Sweeney
        John Roberts
        Steve Conley

# EXHIBIT F

## Dana Myers

| | |
|---|---|
| **From:** | Ryan Sweeney |
| **Sent:** | Thursday, April 04, 2019 1:05 PM |
| **To:** | 'T Samango' |
| **Cc:** | Anthony Samango; William Josem; 'John Roberts'; Joseph Cleary |
| **Subject:** | RE: Audit |

Anthony,

I will contact John Roberts and ask him to return your call.

Again, the listed documents in my correspondence must be made available for inspection for the complete audit period. It appears from your email below that you will not provide access to this documentation. If you maintain this position, we will file for a Court Order. I will wait until I hear from John Roberts about the results of your upcoming telephone call.

Further, it is agreed that the Ironworkers will pay Ernst & Young their costs and fees. That is the end of our financial obligation related to this audit. If we are required to file in the Eastern District for a Court Order, we will request the Court further order that Carson pay the legal fees and expenses related to that filing.

Ryan Sweeney

**From:** T Samango <tsamango@carsonconcrete.net>
**Sent:** Thursday, April 04, 2019 12:55 PM
**To:** Ryan Sweeney <rsweeney@cjtlaw.org>
**Cc:** Anthony Samango <as@carsonconcrete.net>
**Subject:** Audit

Mr. Sweeney,

I spoke to John Robert on 3/28/19 to schedule the audit, I have not gotten a response as of today. We are not delaying anything, the scheduling is in your auditors court.

The years available for audit are 2016, 2017, 2018, and 2019 we have a three year record retention policy and as you know your client has already performed at least one audit for every year in the last 40 plus years.

Please point out for me where in our contract (collective bargaining agreement ) that we have agreed to an employer record retention policy or any accounting standards/recommendations.

The employer is only obligated to provide such records, in the course of an audit, "that have any bearing on hours worked by and paid to employees and contributions to Employer's employees and contributions and deductions made or should have been made to the Fund". The documents we offered to the auditor do that and have done that for in excess of 40 years with dozens of other unions including the Iron Workers. John Robert's email dated 3/26/19 says the document list is a "request", we will provide what is necessary to accomplish the audit.

We are not going to exchange documents as you suggest in your letter, the documents can be viewed only in this office.

We are not going to pay for anything involved in this "witch hunt" your email dated 3/22/19 confirms the Ironworkers are paying for the audit.

Anthony J Samango

# EXHIBIT G

**Dana Myers**

| | |
|---|---|
| **From:** | T Samango <tsamango@carsonconcrete.net> |
| **Sent:** | Tuesday, April 09, 2019 12:00 PM |
| **To:** | Ryan Sweeney |
| **Cc:** | Anthony Samango |
| **Subject:** | Audit |
| **Attachments:** | doc06494320190409113105.pdf |

Mr. Sweeney,

I reached out to John Roberts this morning and left him a voice mail about scheduling the audit.

We will make the necessary records available as per the contract (see attachment, Item B) between Carson and your client for the years 2016, 2017, 2018, and 2019.

The documents requested by Ernst & Young exceed what is required to perform the audit as described in the collective bargaining agreement and therefore you have no right to them by contract.

Anthony J Samango

7. Payments:

...l reports and fund payment required in Article VII are due by the fifteenth day of the month following the ...od covered by such reports, and shall be accompanied by a common form to be supplied by Local Union 405. ...id form shall contain such information concerning the details of the payments and hours worked by covered ...mployees as is necessary for the sound administration and operation of all Funds contained herein. A copy of said common form shall be sent with payments due to each Fund Administrator. Reports and payments received in the office of the appropriate Fund Administrator after the thirtieth day of the month following the period covered are delinquent, and shall be subject to forfeiture of the bond so posted and/or cash deposited for the total amount due the Funds, and in addition shall be subject to a collection charge of ten percent of the amount due to each Fund. When an employer initially becomes delinquent, and should the employer continue delinquent in his reports and payments to the Funds as mentioned herein the Union shall have the right to withhold employees covered by this Agreement from the employer, the no-strike clause of this Agreement notwithstanding except:

A.  No employee shall be withheld from an employer under this Section until: (1) The administrator of the Fund(s) shall have first communicated by certified registered mail with said employer apprising him of the delinquency or arrearages, and (2) In the event the said employer fails to satisfy all his obligations to the Fund(s) shall contact the employer and make arrangements for the immediate payment of all monies due the Fund(s). Copies of the delinquency notification shall be sent by the appropriate administrator to the Union and the Local Association at the same time said notice is sent to the delinquent employer. In the event that the delinquent employer shall not have satisfied his total obligations to the Fund(s) within three working days following the receipt of his delinquency notice from the office of the administrator of the Funds(s) as herein provided, the Union shall have the right to withhold its employees as is more fully set forth herein, and in such event the Union shall not be required to involve or resort to the arbitration procedure specified in this Agreement.

B.  Any employer who has been delinquent as defined herein to any Fund(s) specified herein for two consecutive months shall make payments as specified herein on a weekly basis until such time as the trustees and/ or administrators of said Funds(s) are satisfied that said employer can and will make said payments on a monthly basis again without again becoming delinquent. All regulations and rules contained herein, including liquidated damages, strike provisions, and other enforcement actions which would ordinarily apply to a monthly payment shall apply to an employer who must pay weekly except that no written notice of delinquency shall be required once the need for weekly payment has first been established and notice for same given. In the event that the trustees or administrator of any Fund(s) herein deem desirable, the accountants, auditors or authorized representatives are instructed by said trustees to check said records of any employer bound hereto. Such records shall consist of those that may have any bearing whatsoever on hours worked by and hours after the regular quitting time. The overtime premium for the first eight hours on Saturday is time and one-half. All other overtime will be paid at the double time rate, except as provided under shift work. When employees who are employed on such job during the regular work hours whose continuity of employment on such job was interrupted due to job conditions; or when overtime is required on the job, then such employees who have been employed thereon on the last day or days shall not be substituted for by other employees unless such employees are no long on the employer's payroll.

C.  With respect to each of the contribution rates named above, the union will decide on an annual basis the contribution rate for each of the Funds so long as the overall wage and benefit package does not exceed $1.67 for 2018-2019, $1.71 for 2019-2020 and $1.75 for 2020-2021.  GBCA County Commercial Rate $1.62 for 2018-2019, $1.65 for 2019-2020 and $1.69 for 2020-2021.  The Union will provide Employers a wage/benefit sheet on or before June 30 of each year.